Angle, J.
The questions mainly discussed in this case arise under the civil service law- Chapter 354, Laws 1883, amended by chapter 410, Laws 1884. Civil service examinations, as a prerequisite to entering upon the duties of office, appear to have been known to the common law of England more than 500 years ago. In ¡¡¡he city of London, in a tower which is thought to have been one of the earliest portions of Westminster Abbey, is a room where there are 6 horse-shoes, and 61 nails, which, by ancient custom, the sheriffs of London were compelled to count when they were sworn in. In the time of Edward II., when this custom was established, (1308-1327,) it was a proof of education, as only well-instructed men could count up to 61. At the same time it was ordained that the sheriff, in proof of his strength, should cut a bundle of sticks. This custom (the abolition of which has been vainly attempted) still exists, but a bundle of matches is now provided. The original knife is always used. 2 Hare, Walks in London, (H. Y. Ed. 1878,) 272, 273. To secure the theological qualifications of the sheriffs, they were required, not only to take the oaths of allegiance and supremacy as well as the statutory oath of office, but to make a declaration against transubstantiation, and to re *873 -ceive the sacrament within three months after entering upon office, in the presence of two witnesses and one church-warden, and get a certificate that they had done so, signed by the minister and one church-warden, and the two witnesses must also make affidavit of the fact. 14 Petersd. Abr. (N. Y. Ed. 1831,) 429, note.
Section 8 of the act of 1883, as amended by the act of 1884, directed the mayor to prescribe such regulations for the admission of persons in the civil service of the city as might best promote the efficiency thereof, and ascertain the fitness of candidates in respect to character, knowledge, and ability for the branch of service into which they sought to enter; and for this purpose he was directed to employ certain persons to conduct such inquiries, and make .such examination, and to prescribe their duties, and establish regulations for the conduct of persons who might receive appointments in said service. The section also enacted that the regulations so prescribed should, among other things, provide and declare as in the second subdivision of the second section ■ of the act is provided in reference to regulations for admission into the civil .service of the state. Said second subdivision is as follows: “All the offices, places, and employments so arranged, or to be arranged in classes, shall be filled by selections from among those graded the highest as the result of such competitive examinations.” Section 8, as amended in 1884, also made it the duty of the mayor, in and by such regulations, to cause to be arranged in classes the several clerks and persons employed or being in the public service of the city, and that he should include in one or more of such classes, so far as practicable for the purposes of the examination herein provided for, all subordinate clerks and officers in the public service of the city to whom his power under the act extended. Said section then proceeds: “No officer or clerk ■shall be appointed, and no person shall be admitted to or be promoted in either of the said classes now existing, or that maybe arranged hereunder pursuant to said rules, until he has passed an examination, or is shown to be exempted from such examination, in conformity with such regulations.”
Under this direction, the mayor of the city of Rochester prescribed certain regulations by which he classified the civil service of that city, as follows: “Schedule B, (part first.) All officers and members of the police and fire departments. Schedule B, (part second.) All other subordinate officers, clerks, land assistants. Schedule I) shall include all persons employed as laborers or ■day workmen.” This he evidently did under that provision of the law which made it his duty to arrange in classes the several clerks and persons employed or being in the public service of the city; and, with reference to such qualifi■cation, the mayor, by his regulations, further provided as follows: “Appointments shall be made, or employments shall be given, in the positions in Schedule B by selections from those persons graded highest as the result of open ■competitive examination: provided, that vacancies in higher positions in this .schedule may be filled by the promotion of those holding lower position in .the office. ”
There is no pretense that Belknap’s case is covered by Schedule B, part 1, and it need not be further noticed.
The question, then, arises whether his case comes under Schedule B, part 2. To determine this requires an examination of the proceedings of the common council to see what service it was contemplated he should perform. The resolution of the council under which the lamp committee employed him ■was first passed November 1, 1887, and was, “ that not more than one person be so employed, and that the person so employed by the lamp committee shall be paid not to exceed seventy dollars per month from November 15, 1887, to April 1, 1888, and that said person be required to give a bond in the sum of $500 for the faithful performance of his duty; that the police commissioners be asked to require the policemen to report each day the number of lights un.lighted on their beats, and that these facts be reported every day to the per *874 son so employed by the lamp committee.” This resolution was disapproved by the mayor, under section 48 of the city charter, from which disapproval, dated. November 9,1887, as it shows the construction put upon the resolution by the-mayor, I quote as follows: “A resolution adopted at your last regular meeting would seem to empower the lamp committee to employ a person for the next live months at the rate of seventy dollars per month, to receive daily reports from tlie police department of lamps not found lighted by the policemen on their various beats. I am quite sure the police department will cheerfully file such reports with the clerk of your board for your information, and therefore the expense would be wholly unwarranted, and the said resolution is-hereby returned disapproved.” The above disapproval appears to have been presented to the council at a meeting held November 15, 1887, and a votawas thereupon taken upon the question: “Shall this resolution stand notwithstanding the ejections of his honor, the mayor?” And “the resolution was sustained” by the votes of two-thirds of all the members of the common council then in office. The effect of this action, under section 48 of the city charter, was that the resolution should “have full force and effect, notwithstanding the. objections of the mayor.” Under this resolution the lamp committee-employed Belknap, and he commenced his services November 19,1887, and continued them until the 1st day of April, 1888. The commencement of the resolution, “that not more than one person be so employed,” etc., indicates a-reference to something that had preceded it. The next thing preceding it at the meeting of November 1, 1887, was the vote of the common council sustaining the disapproval of the mayor of a resolution of the council passed October 14, 1887, which attempted to authorize and direct the lamp committee* to open and keep a book wherein, on and after October 25,1887, should be entered the name of each street in the city of Rochester wherein any gas-lamps- or electric lights were then placed, together with the number of said lamps or lights, the number of said gas-lamps not burning, the number of said electric-lights not burning, and that such entries should be made in said book on each, and every day thereafter, Sundays excepted. As the resolution of. October-14, 1887, contained nothing about employing any person to do anything, and, as, by the concurrent action of the mayor and council, that resolution was-defeated, I do not see how it can be referred to, to extend the employment provided for in the resolution of November 1,1887, beyond what is actually provided for in the latter resolution. • Possibly, individual members of the council, in originally passing the resolution of November 1st, and then in repassing it over the mayor’s disapproval, November 15th, may have intended to authorize the lamp committee to employ some person to perform the duties or service which, by rejecting the resolution of October 14tli, they had refused to authorize or direct the lamp committee to do. But, whatever may have been the individual intention of members, I cannot find in the resolution of November 1st any duty imposed on the employe under it, except to receive the reports provided for, and that duty has to be inferred from the provision requiring the reports to be made to him. Those duties were the receipt, and, inferentially, the custody, of the reports by the police with reference to the lights and lamps,—duties of a clerical character. In discharging those duties he was in the civil service of the city as a clerk, and the act in question prohibited his employment until he had passed the requisite examination.
The next point is as to the resolution of December 20, 1887, directing the mayor to contract with Belknap, and which resolution was disapproved by the mayor, and his veto was presented at a meeting of the common council, January 17, 1888, w.hen it was laid on the table for the next regular meeting. At such regular meeting it was further postponed for two weeks, and it. finally came up at a meeting held February 7, 1888, when the council .proceeded to vote upon the reconsideration of such resolution so disapproved by the mayor, and two-thirds of all the members elected to the common council *875 voted in favor of said resolution. Section 48 of the city charter provides, in-substance, that at the next meeting of the council after a disapproval by the" mayor it shall proceed to reconsider the resolution disapproved by him, and,if it shall be passed by two-thirds of all the members of the common council then in office, it shall have full force and effect notwithstanding the disapproval. The resolution was a form of legislative action, and is upon the' same footing, and subject to the same regulations, as more formal action by ordinance or bill. Cush. Leg. Assem. § 2403. There is a discussion and decision, as to what power a common council have upon the disapproval of a mayor, in Sank v. Philadelphia, 8 Phila. 118-120, under a provision in a charter somewhat like the above in section 48. The question in that case was whether, on the coming in of a veto by the mayor, and a vote upon the reconsideration having been taken, and the veto sustained, the vote sustaining the veto could be reconsidered, and the court held that it could not. And a portion of the reasoning by which the court arrived at that conclusion was that the maxim, expressio unius, est exelusio altervus, was applicable, and-that everything prescribed by a charter is a prohibition of any other mode. The charter under consideration in that case did not contain the provision incur section 48, that “at the next meeting of the council after a disapproval by the mayor it shall proceed to reconsider the resolution,” etc. Under this-provision, could the common council postpone such reconsideration to the" next meeting, and then at that next meeting postpone it two weeks further,- or did the failure to reconsider at the next meeting after the veto came in give to the veto the effect of defeating the resolution? Against this power to postpone from meeting to meeting the reconsideration of a vetoed resolution, which the charter required should be done at the next meeting after the veto comes in, the reasoning of the court in Sank v. Philadelphia, supra, 120, with a slight change of language, is applicable. If the postponement of the reconsideration which the charter requires to be done at the next meeting can be made from time to time, it is plain that in the end the veto will be overruled, and thus a great constitutional conservation of the rights of minorities and safeguard against inconsiderate legislation be set at nought. There is no safety but in adhering strictly to the constitutional rule. If one postponement can be had, there is no limit to the number that may take' place. The mayor having returned the resolution to the common council, it was competent for the council to give the resolution force and effect, not-' withstanding the executive objections to it, by passing it in the manner and-by the majority required by the charter. Cush. Leg. Assem. § 2381. There' seem good reasons for holding that, to give the resolution such force and ef-feet after the veto of the mayor, the common council must have reconsidered-the resolution at its next meeting after the veto came in. This question was-not made or raised by either party upon the trial or argument, and I should not probably have noticed it here, had not the proposed findings of all par-' ties, in substance, requested me to find that the action of the council on the' 7th of February was the passing of a vetoed resolution. To this I am not-prepared to assent, for the reasons already offered above.
I therefore proceed to examine the case upon the remaining point presented* upon the argument; assuming, as counsel did, that the resolution of Decem-ber 20, 1887, was passed over the veto of the mayor by the vote taken February 7, 1888. The contract which, by that resolution, the mayor was directed to make with Belknap, required Mr. Belknap to examine all street lamps, electric or gas, and their locations, and otherwise to assist the lamp committee in the designation and location of such lamps, and to open and keep a book wherein shall be entered the name of each street in the city whereon such gas-lamps or electric lights are now, or hereafter may be, placed, during the term of said contract, together with the number of said lamps or said lights, and the number and location of any such lamps or lights, *876 nt any time not burning during any hours when the same is provided by ■contract or otherwise to be kept lighted, and the same shall be unlighted,— rsuch entries to be made in said book on each and every day, Sunday excepted, during the period of said contract; also to report to said committee as often as it may require, and at least once a month to the common council, :a general summary for the month preceding of the foregoing matters, and also the number of lamps or lights that have been discontinued, and the authority or cause thereof, if known to or ascertained by him, and the number and location of any and all lamps or lights that have remained unlighted, the name of the company owning or furnishing the same, and the duration •of time when the same shall have been unlighted during such months; and he shall perform such other duties as may be connected with the public street-lighting system of the city during the period of said contract, and as may be re juired, from time to time, by said committee or the common council; and to furnish to said committee and the council, as may be directed, written reports upon any of the subjects aforesaid. Said resolution also provides for the payment of Belknap for his services as “lamp inspector,” and provides for his giving security for his faithful performance of the aforesaid matters. It also provides that Belknap shall examine into any and all complaints or ■charges of any of said lamps or lights having been unlighted at any time during said contract, which shall have been received by him or come to his knowl•edge or information. The above abstract of the duties contemplated to be performed by Belknap shows, I think, quite clearly, that his services or employment would come within Schedule B, part second, of the classification made by the mayor; and it follows that his employment to render such services, if consummated by entering into the contract contemplated by said resolution, would have been a violation of the civil service act. In deciding this ■case, I am not permitted to consider the necessity or the advantage of Belknap’s services to the city, or his real qualifications, or the wisdom of his employment. The entire question before me is whether the services he was to render under either resolution came within Schedule B, part 2, and I have arrived at the conclusion that they do fall within that portion of the •schedule. I do not allow costs, because the case seems to have originated and to have been conducted in an amicable spirit, to obtain an adjudication upon the civil service act, and the regulations of the mayor under it. The question is a new one, arising under a recent statute, and the plaintiff’s requests do not ask for costs.